UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| _____ | Civil Action No. |
| CHRISTOPHER AYALA-MELENDEZ ) | |
|       Plaintiff ) | |
| ) | |
| v. ) | |
| ) | |
| OFFICER SHAWN G. TIVNAN, OFFICER ) | |
| BRETT J. KUBIAK and the CITY OF ) | |
| WORCESTER ) | |
|       Defendants ) | |
| ) | |
| _____) | |

**COMPLAINT AND REQUEST FOR JURY TRIAL**

<u>INTRODUCTION</u>

1.   This is an action in civil right for injuries inflicted by a Worcester police officer when he set a vicious police dog on a peaceful, unsuspecting man from behind without provocation or legal cause of any kind whatsoever, then failed to seek prompt medical attention for the resulting injuries and falsely and maliciously charged him with serious crimes based on fictional account of riotous conduct. The victim was guilty only of requesting permission to enter his home, which at the time was surrounded by police responding to a disturbance in which he played no part. As he calmly addressed an officer, who engaged with him and gave no sign of concern about his conduct, Officer Shawn G. Tivnan grabbed him from behind and swung him into the jaws of K-9, as a second officer joined in the assault. The plaintiff suffered a number of lacerations and abrasions, was traumatized by the experience and subjected to great public embarrassment, concern for his reputation and future, and legal expense arising from publicized accusations of assault and battery on police, resisting arrest and disorderly conduct.

2.   The Defendant City of Worcester is sued for its policy or custom of tolerating unreasonable force and other misconduct by its officers. These policies created a climate that permitted officers to believe they could violate the rights of citizens without any repercussion.   The City's policies or customs permitted Officers Tivnan, Kubiak and other to continue working as police officers.

JURISDICTION AND VENUE

3.     This action is brought under 42 U.S.C. § 1983 and § 1988 for violation of rights guaranteed by the Fourth and Fourteenth Amendments to the United States Constitution. Title 28 U.S.C. § 1331 and § 1343 provide jurisdiction over all federal claims, and 18 U.S.C. § 1367 provides supplemental jurisdiction over state law claims.

PARTIES

1.     Plaintiff, Christopher Ayala, ("Mr. Ayala") is a resident of the City of Chelsea, Suffolk County, Massachusetts.

2.     Defendant Officer Shawn G. Tivnan, ("Officer Tivnan") was at all pertinent times a duly appointed and sworn Worcester police officer.   Officer Tivnan resides at 77 Irish Lane, Rutland, Worcester County, Massachusetts.

3.     Defendant Officer Brett J. Kubiak, ("Officer Kubiak") was at all pertinent times a duly appointed and sworn Worcester police officer.  Officer Kubiak resides at 9 Founders Ct. Oxford, Worcester County, Massachusetts.

4.     Defendant City of Worcester ("the City") is a duly chartered municipal corporation of the Commonwealth of Massachusetts with a place of business abode at 455 Main Street, Worcester, Worcester County, Massachusetts.

5.     Officers Tivnan and Kubiak are being sued in their individual capacities.

FACTS

6.     Each of the foregoing paragraphs is incorporated as if fully set forth herein.

7.     At all times material to the complaint, the City of Worcester and its police department employed Officer Tivnan, a duly appointed and sworn Worcester police officer ("WPD").

8.     At all pertinent times the City employed Officer Kubiak as a patrolman in the operations division.

9.     At all pertinent times officer Tivnan and Kubiak acted as alleged in this Complaint under color of the laws, statutes, ordinances, and/or regulations of the Commonwealth of Massachusetts and/or of the City of Worcester.

10.     At all times material to this complaint Tivnan was a patrolman assigned to the WPD canine unit.

11.     At all times material hereto the Tivnan had ownership, possession and control of a dog named Mattis ("K-9 Mattis"), a large male mixed Belgium Malinois Shepard that Tivnan kept at home, was registered to him, and that he deployed and handled on duty as a police canine.

12.     K-9 Mattis was trained as a dual purpose police canine, to detect guns, explosives and to track and apprehend suspects.

13.     As part of tracking and apprehension K-9 Mattis was trained to attack, bite and hold persons on command in a manner likely to cause bodily injury or severe bodily injury.

14.     K-9 Mattis was born, raised, and trained in a kennel and was selected as a working dog, primarily based on the traits of aggression and strength.

15.     K-9 Mattis had been trained to track and apprehend suspects by utilizing what is commonly referred to in the canine field as the "bite and hold" technique.

16.     On command, a dog trained to "bite and hold" immediately bites the targeted person, regardless of threat or level of resistance; it then continues biting to hold the person, and it renews the attack if the person manages to escape, until commanded to release by its handler.

17.     Unlike most dogs trained to bite and hold, K-9 Mattis was trained to bite full-mouth, i.e., using the full capacity of the jaws and all 42 teeth, including incisors at the front of the mouth and molars in in the back order to strengthen the hold on a suspect.

18.     Dogs that bite full-mouth pose a heightened risk of injury to persons they apprehend.

19.     Bites by trained police dogs such as K-9 Mattis are substantially likely to result in serious lacerations and other serious bodily injuries to others who come in contact with them.

20.     Officer Tivnan knew that serious injuries in the course of apprehension by a canine are common and to be expected, especially with a dog trained to bite with its full mouth.

21.     Although death from police canine encounters are not frequent, serious and even fatal injury is a foreseeable result of the use of this type of force.

22.     The use of a "bite and hold" apprehension with a dog such as K-9 Mattis is a use of force likely to result in serious bodily injury; or in the alternative it is a use of so-called "less-lethal" force when use of potentially lethal force is permissible; it is potentially (and in some instances has actually been) a use of deadly force.

23.     Attacks by dogs trained like K-9 Mattis are invariably aggressive and as likely to inflict injury as any other weapon in the police arsenal other than firearms with live ammunition.

24.     The teeth of dogs like K-9 Mattis, up to three centimeters long, are highly likely to penetrate the flesh of a subject enough to cause neurovascular, tendon, and soft tissue injuries, including severe and disabling injuries and disfigurement from deep puncture wounds, lacerations, shredded or missing flesh, and damage to muscle or other tissues, nerve damage, mutilation and scarring.

25.     The jaws of a large dog like K-9 Mattis can exert pressures of 450 pounds per square inch (psi), enough force to penetrate light sheet metal.

26.     Medical literature and studies have demonstrated that the bite forces of K9 dogs were between 450 and 800 psi.

27.     K-9 Mattis was not trained to avoid biting vulnerable or vital areas of the body.

28.     Medical studies have documented that compared to injuries by domestic pet dogs, police dogs inflict more serious injuries, are more likely to attack vital parts of the body such as the head, neck, chest, and their victims are more likely to require hospitalization and surgery.

29.     Comparative studies have shown that in police departments with no mandate or policy regarding use of canines people attacked by police dogs require emergency room hospital visits four times more frequently than those subjected to Tasers or Stun guns and three times as often as those given baton strikes.

**The WPD Canine Policy**

30.     At all times material to this complaint the WPD had "Worcester Police K-9 Guidelines," Policy and Procedure No. 401, dated October 19, 2017.

31.     During the same period of time the WPD also had a use of force policy (Policy 400, issued on August 10, 2018) setting forth a continuum model in the use of force geared to the degree or compliance or resistance by a subject interacting with police officers.

32.     The said policy describes techniques and criteria for the appropriate use of force, ranging from verbal instruction and warning to low-impact compliance techniques and up to chemical agents, impact weapons, and firearms.

33.     At all pertinent times the said policy was silent as to where police dogs fit in the use of force continuum – nowhere in Policy 400 did the words "K-9" "canine" or "police dog" appear.

34.     However the WPD K-9 policy discussed lethal and so called "less lethal" weapons as follows:

        A.  Firearm
        B.  Police Canine
        C.  O.C. Aeorosol Spray
        D.  Baton
        E.  Pepperball/40MM Gas Launcher
        F.  Electronic Control Device (Taser)
        G.  Less Lethal Shotgun
        H.  Tools of immediate means or opportunity

I.   Personal Weapons, i.e., hands, feet, head, etc.

35.   The policy recognized the use of canines on people as second only to guns as to the level of force and danger and as a greater level of force than the use of any other tool or technique.

36.   Policy 401 expressly provided in paragraph 20 (A) that "[o]nly the amount of force that reasonably appears necessary to apprehend or secure a suspect shall be used.  Handlers and their dogs are required to adhere to procedures that properly control their potential use of force and channel their specialized capabilities into legally responsible crime prevention and control activities."

37.   Paragraph 20(B) of Policy 401 also provided: "Canine handlers are responsible for determining whether a situation justifies canine use and the appropriate special measures that should be taken."

38.   Paragraph 18 of Policy 401 provided that police dog handlers such as Tivnan "…[s]hall maintain complete control over their dogs to ensure the utmost safety to the public."

39.   WPD Policy 401 also provided that in crowd control situations – such as riot, imminent threat of riot, or other unruly public disturbance --  canine teams could be deployed on orders of the Chief of Police, the Deputy Chief of Operations, or their designees, but they should "not be used as a primary means/tactic for controlling crowds."

40.   WPD Policy 401 also addressed allowable uses of canines in arrest situations. It required officers to assess the seriousness of the crime involved, the level of a suspect's resistance or threat to an officer, and the danger to the community the suspect posed.

41.   For purposes of criminal apprehension under policy 401, a K-9 handler must have probable cause to believe the suspect has committed a crime involving the use or threat of violence.

42.   Policy 401 provided that whenever possible the K-9 handler "shall allow the suspect or suspects to surrender by giving a warning announcement prior to the release of a canine for the purposes of apprehension."

43.   Under the Policy 401, once a canine has effectuated an apprehension (a euphemism for biting and holding a suspect) "the canine is trained to maintain the bite during any resistance provided by the suspect. The handler will immediately advise a suspect to stop fighting and/or resisting the canine and the handler will command the canine to release the suspect."

44.   The policy also required that, where a canine was used in apprehension, "[o]nce a suspect has been handcuffed, and searched, the handler will ensure that the suspect is provided immediate medical attention for any injury sustained." *Id*.

45.    In addition, under Policy 401, a dog handler like Tivnan must report on the use of the dog and the injuries (K-9 Mattis) inflicted on the suspect.

46.    Policy 401 also provided that when officers used lethal or less-lethal levels of force "a verbal report of the incident shall be made to officer's supervisor as soon as practically feasible."  See Policy 401 at ¶ 12. *Id.*

47.    It was clearly established at all pertinent times by the stated policy and practice of the WPD that as a dog handler Officer Tivnan, was required to maintain command and control of his canine at all times, including during use of the dog in apprehension.

## THE BEER GARDEN INCIDENT OF OCTOBER 26, 2019

48.    On October 26, 2019 at approximately 12:33 am, Officer Michael Sullivan was assigned to the so-called Worcester police "Bar Impact overtime" crew.

49.    He was responsible for doing a police detail 68 Franklin Street, the "Beer Garden" bar where at night on the aforesaid date there was a Halloween party at the Beer Garden.

50.    During the party a fight broke out among patrons of the bar and Officer Sullivan called for assistance, according to police reports, and advised that the bar was closing due to a "large unruly crowd that gathered."

51.    The trouble also spilled from inside the bar onto Franklin Street.

52.    Numerous members of the WPD responded the incident and a number of people were arrested by officers, some of whom police assaulted in the process.

## The arrest and mauling of Ayala Melendez

53.    On the night in question Ayala Melendez was a lawful tenant and occupant of an apartment at 60 Franklin Street.

54.    The front entrance to the 60 Franklin Street building where Ayala Melendez lived abuts the building the Beer Garden occupied, on the north side of the bar.

55.    That night, Ayala Melendez left his apartment with his girlfriend to go for a walk.

56.    Neither Ayala Melendez nor his girlfriend patronized the Beer Garden that evening nor did they have any intention of doing so.

57.    Neither Ayala Melendez nor his girlfriend were in any way involved or contributing to disturbance at the Beer Garden, nor was their conduct in the vicinity of the Beer Garden in any way disorderly or otherwise unlawful.

58. When Ayala Melendez and his companion tried to return to his apartment he saw the commotion in and outside of the bar and a group of approximately 9 to 10 officers in front of the bar and his own building

**What video surveillance shows**

59. Three of the Worcester officers positioned in the vicinity were Officers John Doe, Officer Kubiak and Officer Tivnan with K-9 Mattis unmuzzled and in the heel position on Officer Tivnan's left.

60. A video surveillance recording from Ayala Melendez' building shows him walking towards his building entrance, stopping as Officer Doe raises an open hand and addressing the officer while pointing towards the entrance of 60 Franklin that Ayala Melendez had to enter in order to reach his home.

61. Ayala Melendez' demeanor was calm and compliant; he made no move to get past Officer Doe, and though the video has no sound it shows him speaking normally – not shouting or agitated, and the demeanor and facial expression of Officer Doe portrays no concern on his part about Ayala Melendez.

62. At no time did Officer Doe try to restrain Ayala Melendez, use force of any kind against him, or call for any other officer to do so.

63. Ayala Melendez addressed officer Doe in a normal tone of voice, pointing out the entrance to his building a few steps away asking for permission to enter.

64. Ayala Melendez faced Officer Doe with his back toward Officer Tivnan, who was nearby with his back turned to Ayala Melendez and Officer Doe.

65. At that time to this point there had been no interaction between Ayala Melendez or Officer Tivnan or K-9 Mattis, and as Officer Tivnan was facing away there was no sign that he was observing Ayala Melendez or had any concern about him.

66. Before Officer Doe could respond to Ayala Melendez, Officer Tivnan turned his upper body toward them and without pause or warning grabbed the unsuspecting Ayala Melendez by the left arm from behind, and forcefully swung him to the left as he set the dog on him.

67. Officer Tivnan new that his aggressive actions would immediately trigger an attack on Ayala Melendez by K-9 Mattis, which proceeded straight away as dog lunged, bit Ayala Melendez in the back and continued to attack him.

68.     Officer Tivnan had not observed and had no basis to believe that Ayala Melendez' conduct met any of the policy criteria that could justify the use of such force on a subject accused or suspected of no crime, not fleeing, and whose conduct could not be reasonably perceived as assaultive or threatening in any way, shape or form as to any person, property, or dog.

69.     Other police departments limit deployment of canines to the following felony crimes, burglary, robbery not including thefts accompanied by low level assaults, homicide, kidnapping, arson with threat to harm, serious sexual assault, drive by shooting including unlawful discharge of a firearm.

70.     Or they limit deployment of canines to the following misdemeanor crimes: for domestic violence assault, domestic violence order violation that are subject to mandatory arrest where the subject is considered armed and there is a threat of harm to the public and approval by an on scene supervisors.

71.     As soon as K-9 Mattis bit Ayala Melendez two other officers joined and forcefully pulled him towards the ground and Ayala Melendez was brought to the ground and handcuffed.

72.     One of the officers was Officer Kubiak.

73.     When Ayala Melendez' girlfriend tried to find out why her boyfriend was thrown to the ground by police she was also grabbed and thrown to the ground by another police officer.

74.     There was no legal justification for Officer Tivnan's and Kubiak's actions. See **Ex. 1**, four photographs extracted from a video surveillance camera.

75.     No reasonable officer would have assaulted Ayala Melendez or would have deployed a police canine capable of causing serious bodily injury without giving prior warning and instruction as to what the subject must do to avoid being put at the mercy of a vicious dog.

**The Police Account:**

76.     Officer Kubiak prepared a false account of the incident in order to conform report with Officer Tivnan's false police narrative.

77.     Officer Kubiak stated in his report: "While attempting to disperse the crowd. I observed K-9 Officer Tivnan ordering a male suspect, later identified as·Christopher Ayala-Melendez to lay down on the ground. C. Ayala-Melendez was refusing commands to lay on the ground and continued to swing his body violently while K-9 Mattis was engaged on his shirt. Due to his refusal to obey orders to lay down on the ground, I grabbed ahold of C. Ayala-Melendez and brought him to the ground. C. Aayala-Melendez was then secured into handcuffs (Refer to Ole. Tivnan Report).

78.     Officer Tivnan also filed a false account of the incident to inculpate Ayala Melendez and to charge him criminally as a result of his own misconduct.

79.     Tivnan falsely reported: "I observed officers up against the building trying to protect arrestees as the crowd closed in. More officers arrived and attempted to disperse the violent crowd, several people pushed past in an attempt to go towards the officers with the arrestees. One such male, later identified as Christopher Ayala-Melendez, pushed past officers and was yelling towards the arrestees. I gave him a lawful order to leave the area and he refused. I was able to gain control of his upper right arm with my right hand to stop him from interfering with officers attempting to restore order. I then attempted to escort Ayala-Melendez away from the affray. Ayala-Melendez broke free from my grasp and came towards me and K-9 Mattis aggressively and assaulted me by pushing me with his hands on my right shoulder. It should noted that I was a fully uniformed police officer giving him a lawful command, with a police K-9 at the heel position, wearing a harness labeled "WORCESTER POLICE" and a Worcester Police patch. I then performed a palm heel strike to Ayala-Melendez's upper body in an attempt to cease his assaultive behavior and create distance, causing him to spin. At the same time, per training, K-9 Mattis reacted to stop the assaultive behavior towards me and bit Ayala-Melendez in lower left back. I immediately gave commands to Ayala-Melendez to step away and get on the ground. At this time Ayala-Melendez's sweatshirt began to rip as he moved away from K-9 Mattis and I again gave commands to Ayala-Melendez to get on the ground to which he refused. He was taken to the ground by other officers and into custody (See supplemental reports).

80.     Ayala Melendez did not push past any officer nor was he yelling towards the arrestees or anyone else.

81.     Ayala Melendez did not break free from Tivnan, did not come towards Tivnan or towards K-9 Mattis in an aggressive manner nor did he assault or push Officer Tivnan.

82.     Officer Tivnan filed this false police narrative intentionally, knowingly, and maliciously.

83.     Officer Tivnan maliciously brought serious criminal charges against Ayala Melendez: Assault and Battery on a Police Officer, Resisting Arrest, and Disorderly Conduct.

84.     A charge of Assault and Battery on a police officer is a misdemeanor which carries a potential jail sentence of punished by imprisonment for not less than ninety days nor more than two and one-half years in a house of correction or by a fine of not less than five hundred nor more than five thousand dollars.

85.     A charge of resisting arrest caries punishment by imprisonment in a jail or house of correction for not more than two and one-half years or a fine of not more than five hundred dollars, or both.

86.   Officer Tivnan was grossly negligent and deliberately indifferent to Ayala Melendez' by failing to inform him he was being arrested or to warn and instruct him before setting K-9 Mattis on him as required by WPD policy and acceptable police practices.

87.   Officer Tivnan knew to a certainty that his actions would result, that K-9 Mattis would bite, injure and traumatize Ayala Melendez.

88.   There was no legal justification for Tivnan's actions and no reasonable officer would have released a police canine capable of biting an individual or causing serious bodily injury without reason or basis and without warning.

89.   Ayala's Melendez' assault mauling by Tivnan and his dog, K-9 Mattis was unprovoked, constituted an egregious assault and battery and an unreasonable and unnecessary use of force in violation of plaintiff's well established constitutional rights.

90.   Officer ivnan's unreasonable use of force, his assault on Ayala Melendez or in the alternative his gross negligence and recklessness in control of K-9 Mattis resulted in injury to the plaintiff.

91.   As K-9 Mattis' handler, Officer Tivan was at directly responsible for Mattis' control.

92.   If Officer Tivnan instead of deploying K-9 Mattis had opted to use any type of knife or sharp instrument to cut or slash Ayala Melendez in manner similar to the injury K-9 Mattis caused, such conduct would amount to the crime of aggravated assault and battery with a dangerous weapon.

93.   Because Officer Tivnan knew K-9 Mattis had bitten Ayala Melendez he had a duty to provide him with immediate medical attention for any injury sustained in accordance with WPD Policy 401.

94.   But instead of ordering that Ayala Melendez be immediately transported for medical treatment to the University of Massachusetts Medical Center he instead instructed the wagon driver he be transported to the WPD station.

95.   Officer Tivnan was deliberately indifferent to the medical needs of Ayala Melendez by failing to provide prompt medical care for his wounds.

**Ayala-Melendez's booking**

96.   After his arrest Ayala Melendez was brought to the cell room of the WPD. He was brought out for booking at 1:58 am, almost one and half hours after he was mauled by K-9 Mattis.

97.   During booking the booking officer asked him a number of questions.

98.    During booking he asked if the officers could loosen his handcuffs.

99.    He was asked if he was sick or injured.

100.    Ayala Melendez responded "Just a dog bite."

101.    He was asked if he was in need of  "immediate" medical attention."

102.    He responded "No, I think I'll manage."

103.    Again he was questioned on whether he needed immediate medical attention and he replied "I don't think so."  Ayala Melendez told police he didn't know if he was suffering from stress or something else.

104.    Because he was handcuffed to his back, he was unable to assess the severity of his injuries.

105.    Ayala Melendez told the booking sergeant he would get medical attention the next day because he needed to go to work.

106.    The booking sergeant asked Ayala Melendez if his injury came from a dog bite, i.e., a K-9, and he replied it did.

107.    The booking sergeant then asked Ayala Melendez if he was alleging excessive force had been used against him and he responded he was making that allegation.

108.    Upon inspection of his injuries, one of the officers in the booking room told Ayala Melendez he had a "minor" injury, adding that it "could have been a lot worse."

109.    Ayala Melendez's injury was not trivial or de minimis.

110.    Ayala Melendez asked the booking officer "Is this going to go on my record?"

111.    He was told "most likely."

112.    Ayala Melendez a responded? "Okay, am I able to fight it?"

113.    He was told "most likely" that he could contest the charges in court.

114.    The booking supervisor did not ask Ayala Melendez why he alleged excessive force.

115.    A number of individuals arrested that night at the Beer Garden, including Ayala Melendez, complained to the booking sergeant that police had employed unreasonable force during their arrests.

116.    One of them told police she had been slammed onto the ground.

117.    A video surveillance seems to suggest a female was put on a headlock by police until she lost consciousness.

118.    Another female complained "I got smashed on the ground."

119.    It wasn't until very recently that the WPD booking officers began questioning of arrestees about excessive force allegations during the booking process in cases that involved force and injuries to prisoners.

120.    Given Ayala Melendez' allegations during his booking the Worcester Police Department had no other alternative but to "investigate" these incidents.

121.    In recent years police administrators in the WPD, Chiefs, Deputies, and City Administrators took the position that verbal complaints by injured prisoners of excessive force during the booking process were not formal "complaints" triggering investigation by the WPD Bureau of Professional Standards.

122.    The net effect of that policy was to keep the formally recognized citizen complaints at an artificially low level.

**The City of Worcester policies:**

123.    The City of Worcester and the WPD allowed a policy and custom to exists in the Worcester Police Department that allowed officers including Officer Tivnan to employ unreasonable force, violate civil rights and to engage in misconduct.

124.    The WPD had a policy and custom of failing to discipline officers who violated the rights of its citizens.

125.    The WPD Bureau of Professional Standards in charge of investigating violations to the policies and procedures of the police department including those of excessive force invariably favored police testimony over civilian testimony.

126.    The BOPS largely and often ignored credible allegations and evidence of police misconduct.

127.    The WPD rarely, if ever, affirmed or sustained citizen complaints of unreasonable force by members of the WPD.

128.    In the lion share of investigations in which citizens alleged unreasonable force the officers were exceptionally cleared of any wrongdoing.

129.    The investigatory process and practices to investigate citizen complaints is flawed and does not comply with acceptable and professional police practices.

130. By way of example, the WPD investigatory policy allowed police officers to submit written statements without participating in in-person interviews while complainants were subject to adversarial interrogation by WPD officers.

131. The net effect of this policy results in automatically clearing officers of excessive force complaints where complainants would not submit to personal interrogation, even when criminal charges were pending against them.

132. Acceptable investigatory practices require that all interviews of police officers accused of violations to the WPD policies and procedures should be conducted in person,  that they be recorded and transcribed other than for minor procedural violations.

133. Without in person interviews of officers accused of misconduct the City and police administrators cut off an important investigatory avenue to get collect all relevant facts.

134. The policy that allows investigations to proceed without requiring in person interview of officers allowed officers investigated of misconduct to generate vague, perfunctory use of force reports or injured prisoner reports conveying an impression of oversight while the reports in fact did not enable substantive review of officers' conduct by police administrators.

135. When determining the discipline to be meted against offending officers, Chiefs of Police, present and past, including City Managers, have for the most part consistently given a choice to WPD officers --even those who can be potentially charged with criminal conduct, to quietly retire from the police department, preserve their police pension instead of being criminally prosecuted like any other citizen.

136. This policy, custom or practice led police officers including Officer Tivnan to believe they were the above the law, that they could violate the rights of citizens because they knew they would not be disciplined.

137. Upon information and belief, the City of Worcester permitted an unconstitutional policy, custom and practice that allowed the unreasonable use of police K-9 dogs, including K-9 Mattis to attack and bite citizens and took no steps to monitor and regulate such unlawful use of force.

138. The City of Worcester failed to adequately train, supervise, control, monitor and discipline officers, including Officer Tivnan in their use of force and in their use of K-9 dogs to apprehend persons.

139. Upon information and belief, the City of Worcester failed to track canine deployments and canine apprehensions and to regularly evaluate such incidents and injuries arising therefrom so as to properly assess and control its canine unit and individual canine teams.

140.   The City of Worcester knew that canine bites cause serious injuries to citizens and that there was an obvious need to train both handlers and canines in the appropriate use of force, and that the failure to do so results in the violation of citizen's rights when they come in contact with K-9's.

141.   The City of Worcester failure to properly train K-9 officers and K-9's, including Officer Tivnan and K-9 Mattis included the failure to instruct Tivnan on acceptable police practices and the proper use of force.

142.   At all times pertinent hereto the City of Worcester observed a policy, custom, and usage of failing to exercise discipline and control over the use of force by its police officers and did so with deliberate indifference to the rights and well-being of person, including the plaintiff.

143.   The City of Worcester also failed to monitor and control the use of force of its police officers to assure that force would be used no more often, and to no greater degree, than was necessary and lawful.

144.   The aforesaid policy effectively allowed officers to operate in the field with little supervision and without effective monitoring and at all times pertinent hereto the defendant officer was aware that this was the case.

145.   These policies, customs and practices of the City of Worcester were the moving force behind the violations of Ayala Melendez's constitutional rights committed by Officer Tivnan and Kubiak.

**Ayala Melendez's injuries**

146.   As a direct and proximate cause of Defendants' conduct, Ayala Melendez suffered physical and emotional injuries, described below.  He also incurred medical expenses. **Ex. 2** is a photograph of his physical injuries at the police station.

147.   His emotional injuries manifested themselves in various ways, including difficulties with sleep, fear, nightmares, fear of the police and dogs and hypervigilance.

148.   When the baseless charges and false account of his conduct were publicized in the media, Ayala Melendez was greatly distressed and embarrassed, as he received inquiries from friends and family about the incident and appreciated the broad public dissemination of Tivnan's false allegations and the criminal charges.

149.   In addition Ayala Melendez had to spend money to hire a criminal defense lawyer to represent him in court.

150.   By the actions described above, Officer Tivnan and Kubiak deprived Ayala Melendez of the following clearly established and well-settled constitutional rights:

- Freedom from the use of excessive and unreasonable force;
- Freedom from summary punishment;
- Freedom from the deprivation of liberty without due process of law;

151. Defendants subjected the plaintiff to these deprivations knowingly and maliciously.

152. Ayala Melendez' had to hire counsel to defend him against frivolous criminal charges.

153. Ayala Melendez' criminal defense counsel provided video surveillance of the incident to the Office of the Worcester District Attorney's Office which contradicted Tivnan's report and his false police narrative.

154. On June 16, 2020, the Office of the Worcester County District Attorney's office filed a motion to dismiss with the Worcester District Court.

155. The District Attorney's Office moved to dismiss the criminal complaint against Ayala Melendez without prejudice claiming "The Commonwealth makes this request after a review of the currently available evidence in this case, including police reports and video surveillance tapes." **Ex. 3.**

156. Without the existence of this highly exculpatory video Ayala Melendez faced the possibility of being found guilty and possibly of jail time.

157. The District Attorney's Officer provided the WPD copies of the video surveillance recording that cleared Ayala Melendez from any wrongdoing.

158. Upon information and belief, Officer Tivnan was not disciplined and continues to work in the WPD canine unit.

159. Ayala Melendez case presents a compelling and textbook case for why officer body worn cameras are so critical to police accountability in the City of Worcester, especially for units such as a the canine unit.

160. Other recent events in the City of Worcester underscore the need to require the use by WPD of body worn cameras.

161. By way of example and not limitation, on June 1, 2020 members of the WPD arrested a group bystanders that were observing or filming the interactions between protesters and the WPD in the aftermath of a downtown Black Lives Matter demonstration.

162. Despite the deployment of police suited in riot gear none of the WPD officers that participated in the operation wore body worn cameras.

163.    The live stream video of one of the individuals shows a Worcester police officer purposely stomping on that person's phone to destroy any evidence from her arrest or the arrest of her boyfriend.  https://www.telegram.com/news/20200627/video-appears-to-show-police-stomping-on-clark-grads-smartphone-after-riot-arrest

164.    Another cell phone video taken by a photojournalist who had the right to film the police contradicted in large part the City of Worcester and police narrative by demonstrating that the WPD escalated their use of force by firing a large volley of so called "less-lethal" weapons.

165.    The photojournalist was arrested and told by the arresting officer he was going to break his "Fucking arms" and called him a "Fucking faggot. " The arresting officer told him that on his ride to the police station in the police wagon he would have to deal with bunch of angry "Spics" that were going to harm him.  His phone was seized and an important portion of his video surveillance was erased by the police.

166.    A white female who participated in the earlier Black Live Matters protest was beaten by members of the WPD.  She was called a "Nigger lover" by officers that came in contact with her.

167.    Her boyfriend was also beaten, their arrest reports were described with opaque description of the officers use of force.

168.    Another individual JA was livestreaming inside of a vehicle when a group of officers forcefully extricated him from the inside of a vehicle after uttering words that constitute protected speech.

169.    JA phone was confiscated and placed in the pocket of one of the arresting officers who never returned the phone to Worcester police.  The audio from JA phone continues for close to eleven minutes and demonstrates conversations between police officers and other civilians they arrested. https://www.telegram.com/news/20200630/two-arrested-at-june-1-protest-allege-police-improperly-seized-phones

170.    The WPD officer who stole JA's phone never returned it as evidence.

171.    More recently a civilian phone video showed what appeared to be a Worcester police officer slapping a man tied up in an ambulance stretcher.  https://www.masslive.com/worcester/2020/07/video-showing-what-appears-to-be-worcester-police-officer-slapping-man-in-stretcher-part-of-an-internal-investigation.html

172.    An officer body worn camera would have deterred any such conduct on the part of the officer.

173.    Despite these shocking revelations the reaction by City of Worcester, its Chief of Police and the City Manager have been astonishing.

174.   On July 11, 2020 Chief Sargent gave a statement to the local paper supportive of body cameras claiming they "increase transparency, resolve complaints, de-escalate volatile situations, and improve our training." https://www.telegram.com/news/20200711/why-do-area-police-departments-lack-body-cams-cost

175.   Less than nine days later Chief Sargent told another local reporter in a press release that although body worn cameras are an effective tool to document civilian vs. police interactions that increased police transparency he also decried the downside to body cameras. https://www.telegram.com/news/20200721/worcester-pursues-police-body-cameras-and-way-to-pay-for-them

176.   Chief Sargent stated in a report to the City "Some officers felt pressure to maintain the demeanor of someone testifying in court."

177.   Chief Steven M. Sargent wrote about body cameras "This has the potential to hurt officers' enjoyment of their jobs, and to reduce community engagement."

178.   Chief Sargent claimed "Some officers might be less willing to engage in proactive policing when they are afraid that every mistake they make has the potential to subject them to public criticism."

179.   Chief Sargent told the press some officers might also be hesitant to use necessary force because they do not want to be portrayed negatively in the media.

180.   All of these deficiencies were the moving force behind the violation to Ayala Melendez' constitutional rights.

<u>COUNT I</u>
42 U.S.C. § 1983
<u>Officer Tivnan and Kubiak -Individually</u>

181.   Each of the foregoing paragraphs is incorporated as if fully set forth herein.

182.   Tivnan  and Kubiak acting under color of law used unreasonable force against Ayala Melendez depriving him of his clearly established right to be free from the use of unreasonable force under the Fourth Amendment.

183.   Officer Tivnan seized Ayala Melendez unlawfully when he, without warning deployed K-9 Mattis on him to attack him.

184.   Defendants Tivnan and Kubiak acted jointly with one another to violate Ayala Melendez's constitutional rights.

185. Tivnan's use of force was egregious because Ayala Melendez was not given an opportunity to comply prior to K-9 Mattis' deployment, was unarmed, cooperative and made no threat by word or act to any person or dog.

186. As a direct and proximate result of Defendants' actions, Ayala Melendez suffered damages.

COUNT II

42 U.S.C. § 1983

Officer Tivnan –Deliberate Medical Indifference

187. Each of the foregoing paragraphs is incorporated as if fully set forth herein.

188. Officer Tivnan  had a duty to provide Ayala Melendez with immediate medical attention for any injury sustained in accordance with WPD Policy 401.

189. Officer Tivnan delayed and denied Ayala Melendez immediate access to medical care and caused unnecessary pain and suffering.

190. As a direct and proximate result of Defendants' actions, Ayala Melendez suffered damages.

COUNT III

Assault & Battery with a dangerous weapon, K-9 Mattis

Officer Tivnan

191. Each of the foregoing paragraphs is incorporated as if fully set forth herein.

192. Officer Tivnan committed an assault and battery with a dangerous weapon, K-9 Cayman, when he released directed the canine to viciously attack and maul Ayala Melendez without reason or cause.

193. As a direct and proximate result thereof, Ayala Melendez suffered damages.

COUNT IV

Assault & Battery

Officer Kubiak

194. Each of the foregoing paragraphs is incorporated as if fully set forth herein.

195. Officer Kubiak committed an assault and battery against Ayala Melendez without reason or cause.

196. As a direct and proximate result thereof, Ayala Melendez suffered damages.

### COUNT V
### Conspiracy
### Defendants Officer Tivnan, Officer Kubiak

197.   Each of the foregoing paragraphs is incorporated as if fully set forth herein.

198.   Defendants Officer Tivnan and Kubiak conspired to concoct and report a false story regarding the circumstances of the arrest and the unreasonable amount of force that they used to arrest Ayala Melendez in an effort to conceal evidence of constitutional violations and thereby violated  rights to due process.

199.   As a direct and proximate result thereof, Ayala Melendez suffered damages.

### COUNT VI
### Malicious Prosecution
### Officer Tivnan

200.   Each of the foregoing paragraphs is incorporated as if fully set forth herein.

201.   Officer Tivnan caused criminal charges to be brought against Ayala Melendez for which there was no probable cause, and he maliciously and for no lawful purpose assisted, participated in and otherwise caused him to be criminally prosecuted.

202.   On June 16, 2020 the Office of the Worcester County District Attorney's moved to dismiss the criminal complaint against Ayala Melendez without prejudice claiming "The Commonwealth makes this request after a review of the currently available evidence in this case, including police reports and video surveillance tapes." Ex. 2.

203.   The dismissal of Ayala Melendez criminal action occurred because there was no credible evidence or probable cause that he had committed any crime.

204.   As a direct and proximate result thereof, Ayala Melendez lost time from his usual activities to attend court and to participate in his defense, and suffered concern and worry due to the reasonable perception that his liberty, well-being and good name were at imminent and serious risk as a result of his criminal prosecution.

### COUNT VII
### 42 U.S.C. § 1983, City of Worcester,

205.   Each of the foregoing paragraphs is incorporated as if fully set forth herein.

206.   The individual WPD Defendants' violations of Ayala Melendez constitutional rights were caused by the policies and customs of the City of Worcester as described above.

207.    As a direct and proximate result thereof, Ayala Melendez suffered damages.


<u>DEMANDS FOR RELIEF</u>

The Plaintiff hereby respectfully requests the following relief:

1.      All compensatory damages recoverable;
2.      Injunctive relief;
3.      All punitive damages recoverable;
4.      All attorney's fees, costs and expenses allowable;
5.      Joint and severally liability as to all defendants;
6.      Strict liability against the owner and handler of the dog for the injuries caused;
7.      All remedies available according to the law of damages for the plaintiff;
8.      Any and all other relief as the Court deems just and proper.

<u>PLAINTIFF DEMANDS A JURY TRIAL AS TO ALL COUNTS IN THE COMPLAINT</u>


Respectfully submitted,
Christopher Ayala Melendez, Plaintiff


By his attorneys,

*/s/ Hector E. Pineiro*
_____
Hector E. Pineiro, BBO # 555315
Robert A. Scott BBO # 648740
Law Office of Hector E. Pineiro, P.C.
807 Main Street
Worcester, MA 01610
Tel. (508) 770-0600
hector@pineirolegal.com
robin@pineirolegal.com

*/s/ Joseph F. Hennesey*
_____
Joseph F. Hennessey, Esq.  BBO#669552
Law Offices of Joseph F. Hennessey
807 Main Street
Worcester, MA 01610
Tel: 508 881-9500
j@hennesseylaw.net

DATED: August 1, 2020